Hunter v. Hudson River Iron and Machine Co.

[St. Lawrence General Term, September 3, 1855.   *Hand, C. L. Allen* and *James,* Justices.]

———————

Hunter and others *vs.* The Hudson River Iron and Machine Company.

In an action commenced under sections 206, &c. of the code, for the claim and delivery of personal property, where the complaint is in the form of the old declaration in replevin in the detinet, and charges that the defendants have become possessed of, and wrongfully detain the goods and chattels, and the plaintiffs proceed upon the ground that the title to the goods was never changed, but remained in them, because the same were purchased of the plaintiffs, and the delivery thereof procured, through the false representations of the vendees as to their solvency and credit, proof of the purchase of the goods by the agent of the defendants, by their direction, and that at that time the defendants were insolvent, is competent evidence, on the question of fraud.

In such an action it is not necessary the complaint should aver a demand of the goods; or that it should contain an allegation of the insolvency of the defendants, or of any of the facts going to establish the fraud.

It is sufficient if it is in the form of the old declaration in replevin in the detinet, and charges that the defendants have become possessed of, and wrongfully detain, the goods and chattels in question.

Where a complaint and answer are both very general in point of form, but neither party demurs, and both have gone to trial with a full understanding of their rights, and neither party has been taken by surprise by the pleading of his adversary, and a full and fair investigation has been had, upon the merits,

such an *amendment* will be allowed as may be necessary to conform the complaint to the facts proved, and as will do substantial justice to both parties.

A sale and delivery of goods, procured through the false representations of the vendee in regard to his solvency and credit, passes no title whatever to the property, as between the parties; and the vendor may maintain an action, under the code, for the claim and delivery thereof.

In such an action, where it appears that the purchase was made by an agent, it is material for the plaintiff to show not only that the purchaser was insolvent, at the time of the purchase, but that such purchaser, or his agent, or both, knew of such insolvency. Hence the declarations of the agent, to third persons, made by him while acting for his principal and within the scope of his authority, and going to show such knowledge on the part of both principal and agent, are proper evidence.

Where a mortgage purports to have been executed by a corporation, through its treasurer, a certificate of acknowledgment stating that the treasurer testified, before the officer, that he was the treasurer of the corporation; that it was a corporation, but had no corporate seal; that he signed his name to the mortgage and affixed his own seal thereto, by the order and resolution of the trustees of said corporation duly made and given in writing; and that the same was executed by him as such treasurer, for the purposes therein mentioned, is *prima facie* sufficient evidence of the due execution of the mortgage, without producing and proving the resolution of the trustees; where the instrument is offered for the purpose of proving an act or acknowledgment of their pecuniary condition, by the mortgagors.

A principal is liable for the fraud or misconduct of his agent: and he not only cannot take any benefit from a misrepresentation, fraudulently made by the agent, but is bound to make compensation for injuries sustained by others, thereby. And this, although the principal may be innocent; provided the agent acted within the scope of his authority.

There need not be express authority to make a particular representation, but the authority may be implied, as incident to a general authority.

A general authority to an agent to purchase goods on credit, is an authority to make the necessary representations as to the credit and solvency of his principal. Such authority is necessarily incident to the power to purchase on credit.

And declarations made by the agent, while applying for goods on credit, as to the credit and solvency of his principal, are part of the *res gestæ*, and are equally obligatory upon the principal as if made by himself.

In such a case, even if the principal does not know, at the time, that the representatinns of his agent are false, he is liable to the vendor, upon the principle that of two innocent parties the one shall suffer who, by his *agent* causes the injury.

THIS action was commenced under section 206 of the code, for the claim and delivery of personal property. The complaint averred that the defendants were a manufacturing com-

pany, formed under the act of March 22, 1811. That the company became possessed of, and wrongfully detained from the plaintiffs, the goods and chattels described in the schedule annexed to it, to the value of $1500, and demanded judgment for that amount. The answer denied the allegations in the complaint, and averred that the goods were wrongfully taken from the possession of the defendants by the plaintiffs or their order, and delivered to the plaintiffs on the 3d of June, 1854, and prayed for a return, with costs. The action was tried at the Washington circuit, in October, 1854, by a jury.

The plaintiffs, after proving the incorporation of the company, introduced as a witness *Charles Amerman*, who proved the partnership of the plaintiffs, which had existed since January, 1852. It was here admitted by the defendants' counsel that the property and goods described in the complaint were purchased of the plaintiffs. by Simeon Mears, as the treasurer of the defendants, and by the direction and under the authority of the defendants, on the 18th of April, 1854; that the value thereof was $1118.03; and that at that time the company was insolvent for many thousand dollars. The defendants' counsel objected to the evidence thus admitted, on the ground that under the pleadings the evidence was not admissible, as there was no allegation of the facts, in the complaint. The objection was overruled, and the defendants' counsel excepted. The witness then further testified, among other things, as follows : " I was present at the time of the sale. I was acting as book-keeper. Mears came to the office of the plaintiffs, and after some general conversation with Mr. Hunter, one of the firm, he spoke about settling his account and purchasing more goods. In the meantime I had drawn out an outline or statement of his account. While thus occupied, Mr. Buckley (another member of the firm) came in and asked Mears how he was getting along. Mears answered that he was doing a good business, and had been. Mears wished to settle the outstanding account and give extended notes. He was acting as the agent of the company, all this time, and it is the account of the defendants of which I have been speaking. Buckley said iron was fetching such good prices the last year that he

ought not to ask an extension. *Mears replied that they were doing very well;* had been doing well; and spoke of another branch of the iron business—a rolling machine—that he was about to engage in, and wished Buckley to take an interest in it. Buckley declined." After some further conversation, the witness testified, it was finally agreed that three notes should be given by the defendant, one of $406 and over, which was payable in May following, and two others, for $280 each, at five and six months. Mears signed these notes as treasurer. Buckley then called Cowles, his salesman, and told him to sell Mears all the goods he wanted. The same day Mears, as agent, purchased goods of the plaintiffs, on credit, to the amount of upwards of $1300. On his cross-examination the witness testified that when Buckley first entered the store, that morning, the first salutation from him was "Hallo, Mears! How are you getting along?" He said, "We are, and have been, doing a good business," or "we are doing a good business, and have been doing a good business." Buckley told him he supposed he had come down to purchase goods, and he said he had. Buckley said, "I suppose you are yet doing well." Mears replied "Yes," or "certainly."

Mr. *Cowles*, the salesman of the plaintiffs, testified that after receiving directions from Buckley, as testified to by Amerman, he sold Mears, as agent for the defendants, on the 18th of April, 1854, goods to the value of about $1400, and that he afterwards identified a portion of the goods, to the amount of $1118.03, on the bank of the canal, which were delivered to the sheriff, for the plaintiffs, and which were afterwards sold by the plaintiffs.

*William H. Dyke*, another witness sworn on the part of the plaintiffs, testified that he was connected with the firm of Hammond and others, at Crown Point, called the Crown Point Iron Company. This testimony was objected to as immaterial, but the objection was overruled, and the defendants' counsel excepted. The witness further testified that his company had large dealings with the defendants, and that there was a balance due them from the defendants, on the 18th of April, 1854, of from $10,000 to $20,000, which was not paid when it fell due. In relation to that indebtedness, the witness said he had a conver-

sation with Mears, the first week in April of that year, and was asked what the conversation was. The question was objected to by the defendants' counsel, but the objection was overruled, and the defendants' counsel excepted. The witness testified that Mears expressed the inability of the company to pay this debt, amounting at that time to between eleven and twelve thousand dollars, and more coming due in a day or two, and wished for an extension of. time. The witness made the remark that there was between four and five thousand dollars under protest. Mears said it was impossible to pay, and remarked *that if he could not get an extension* from creditors he would have to stop business, and *give up the property for the benefit of creditors.* He, Mears, engaged to come to Crown Point the next week and make an exhibit of the affairs of the company to Hammond. He did not come, at the time appointed, but did come the forepart of May following, and made a statement to Hammond, by which he said that the indebtedness of the company was from seventy to seventy-eight thousand dollars, and that the amount of the assets was from thirty to forty thousand dollars.

*Russell W. Pratt* testified for the plaintiffs that he was a trustee of the company in April, 1854, and was present after the middle of May of that year, when Mears made a statement orally, by items, of the indebtedness of the company. He stated the amount of the indebtedness to be about $80,000, and the assets at $20,000 or $21,000. This was a day or two before it was publicly known that the company had failed. It was not known to the witness that the company was insolvent, before this statement was made. The defendants' counsel offered to prove by this witness, that at the time of the conversation and interview testified to by him, none of the board of trustees present knew of the insolvency of the company, and that they all, severally, except Mears, then expressed their surprise at the condition of the company, as then disclosed by Mears. The plaintiffs' counsel excepted to that part of the offer which went to prove the declarations of the company, as immaterial and improper. These were excluded, and the defendants' counsel excepted. No statement of the affairs of the company had been made for three years

498 . CASES IN THE SUPREME COURT.

Hunter v. Hudson River Iron and Machine Co.

previous to that time, although the witness had acted as secretary of the board for a portion of that time.

The plaintiffs offered in evidence an exemplified copy of a mortgage from the defendant to Jonathan S. Beach and Simeon Mears, dated Jan. 30, 1854, acknowledged June 5th, 1854. The mortgage was executed as follows :

" By order of the board of trustees, as per resolution of board, Fort Edward, Jan. 28, 1854.

For the Hudson River Iron and Machine Co.

S. MEARS, Treasurer." [L. S.]

The certificate of acknowledgment was as follows :

" State of New York, county of Washington, ss.  On this 5th day of June, 1854, before me personally came Simeon Mears, treasurer of the Hudson River Iron and Machine Company, to me known, who being by me duly sworn, did depose and say that he resides in the village of Fort Edward, in said county, that he is the treasurer of the Hudson River Iron and Machine Company, that the said company is a corporation, but has no particular corporative seal, that he signed his name to the within, and affixed the seal thereto by the order and resolution of the trustees of the said corporation, duly made and given in writing, and that the same was executed by him as such treasurer, for the purposes therein mentioned.

EDWIN CRANE, Justice of the Peace."

The defendants' counsel objected to the introduction of this mortgage in evidence, unless the authority of Mears to execute it, from the company, was shown.  They insisted that it was immaterial; and that the proof of authority, contained in the certificate, was not evidence, and that the paper was a nullity. The objections were overruled, and the defendants' counsel excepted.  The mortgage was then read in evidence.  It covered all the property, real and personal, of the defendants, and was a mortgage of indemnity to Mears and Beach for $2500, to secure them for having indorsed the paper of the defendants to that amount.

The plaintiffs here rested, and the defendants' counsel moved for a nonsuit on the following grounds : 1. That there was no

evidence to sustain the complaint. 2. That the declarations of Mears were made without authority, and if authorized, a fair construction would not enable the plaintiffs to maintain the suit. 3. That there was no proof that the Hudson River Iron and Machine Company knew they were false. 4. That there was a total absence of proof to show that the defendants were insolvent, at the time the representations were made. 5. That if they were insolvent, it did not make a case for relief in the present form. The judge denied the motion, and the defendants' counsel excepted.

*Simeon Mears* was then called as a witness by the defendants, and was objected to by the plaintiffs' counsel as interested. He was admitted by the court, and the defendants' counsel excepted. He testified that he was the Mears referred to by the witnesses; that he had no knowledge of the insolvency of the defendants, at the time of the purchase of the goods in question, but supposed they were doing a good business, at that time. He further testified, on cross-examination, that he was the treasurer of the company, and had the general charge of its affairs as to a particular department; that he did more of the business than any other individual. The notes of the company were given by him as treasurer. He had the general charge of making sales. The books were kept at the store by clerks, and were in his charge as treasurer. He frequently made entries on them and had daily access to them. He got the information from the books, which enabled him to make the statement testified to by Pratt. The goods in question formed part of the assets in that statement. That the company was indebted to him individually to between $12,000 and $20,000, though not in all that amount when the goods were purchased, and were otherwise largely indebted at that time, and had had several notes protested for a large amount, before the 18th of April, and had been in the habit of having their notes protested for the last eight years. They were also largely indebted to their hands; to one of whom, at least, they had been thus indebted for more than one year. Several suits had also been commenced against the company before the 18th of April. The extent of the business of the

company was about $100,000, and no examination or inventory of the state of its affairs for two years previous to the time of the making of the statement testified to by Pratt. The witness purchased, and received money, and paid debts, and did a large share of the other business. The trustees had or took no active oversight of it.

The proof being closed, the cause was summed up and submitted to the jury, under the charge of the court. They found a verdict for the plaintiffs for $232 damages, and assessed the value of the property taken at $1118.03.

A case was made, and judgment was suspended by the court, who ordered the case to be heard in the first instance at a general term. A motion was now made for a new trial.

*Hughes & Northrup* and *J. Gibson*, for the plaintiffs.

*A. D. Wait* and *E. H. Rosekrans*, for the defendants.

*By the Court,* C. L. ALLEN, J. Several objections were taken by the defendants' counsel on the trial of this action, and have been urged on the argument here, which it will be proper first to notice and dispose of in their order.

1. It is objected that the evidence of the purchase of the goods in question by Mears as the treasurer of the defendants, and by the direction and under the authority of the defendants, on the 18th of April, 1854, and that at that time the company was insolvent, was improperly received under the pleadings. The action was commenced under section 206 of the code, for the claim and delivery of personal property. The complaint is in the form of the old declaration in replevin in the detinet, and charges that the defendants have become possessed of and wrongfully detain the goods and chattels in question. The plaintiffs proceed upon the ground that the title to the goods was never changed, but remained in them, up to the time of the commencement of the action. They claim to succeed, and must succeed, if at all, on this ground alone. Hence they endeavored to prove that the alleged purchase was made by Mears

Hunter *v*. Hudson River Iron and Machine Co.

by the direction of the defendants while the company was largely insolvent. This was competent evidence, on the question of fraud. It is urged that the complaint is insufficient, in not averring a demand of the goods, and in containing no allegation of the insolvency of the defendants, or of any of the facts offered to be proved. This was not necessary. If the purchase was a fraudulent one, the plaintiffs still retained their legal right in the goods, unless, after discovering the act of fraud, they assented to the sale, either positively or by such delay in reclaiming them as would authorize the inference of an assent. The old cases fully establish the position that a sale and delivery of goods, procured through the false representations of the vendee in regard to his solvency and credit, passed no title whatever to the property, as between the parties, and the vendor might maintain either trover or trespass or replevin in the cepit or detinet, to recover their value, even though the actual possession was in another. In such cases the declaration was sufficient if in the usual form, in those actions. (*Ash* v. *Putnam*, 1 *Hill*, 302. *Cary* v. *Hotailing*, *Id.* 311. *Olmsted* v. *Hotailing*, *Id.* 317. *Matteawan Co.* v. *Bentley and others*, 13 *Barb.* 641. *Root* v. *French*, 13 *Wend.* 570.) The latter case was relied upon by the defendants' counsel to show the necessity of averring a demand, in the complaint. But it is believed that it establishes no such position. It decides with the plaintiffs that a fraudulent purchase of goods gives no title to the fraudulent purchaser, and that the vendor in such case may maintain replevin for the goods. It then goes further and affirms the principle that a bona fide purchaser from the vendee of goods obtained by fraud, without notice, will under certain circumstances, be protected. And, to maintain an action against him, a demand, in some cases, must be made before suit brought. But no such demand is necessary as against the fraudulent vendee. An action, in the nature of trespass, or for the wrongful detention of the property under sec. 206 of the code, may be maintained immediately; that section having been undoubtedly intended as a substitute for the old action of replevin. (6 *How*.

339.) Besides, in this case, no objection was taken, on the trial, of want of proof of demand.

The cases are somewhat conflicting as to what is necessary to be averred in the complaint in an action like the present, under the code. But I think the weight of authority is with the plaintiff, as to the form which he has adopted in this case. A direct and issuable averment that the goods claimed were the property of the plaintiffs; nothing being necessary on their part to be returned, in order to restore the defendants to the condition in which they were at the time of the sale, has been held to be sufficient. (*Vandenburgh* v. *Van Valkenburgh*, 8 *Barb.* 217. 13 *id.* 641.) It has been too often decided that facts, and not the evidence of facts, should be pleaded. The testimony in this case went to show that the goods were fraudulently obtained, and that therefore the title to the property was not changed, and I think was properly received. The defendants might have required the complaint to be made more definite and certain, under sec. 160 of the code. And even if it should be held to have been necessary to set out the facts more fully, I am disposed, after trial, and when the party has had the full benefit of any defense which he chose to make, to grant the plaintiffs leave to amend, so as to conform their complaint to the facts proved. That portion of the answer which avers that the goods in question were the property of the defendants is as general as the complaint. Neither party demurred, and both have gone to trial with a full understanding of their rights. Neither has been taken by surprise by the pleading of his adversary. A full and fair investigation has been had, upon the merits, and such an amendment should be allowed as will do substantial justice to both. (*Code*, §§ 169; 173.)

2. It is further objected that the testimony of the witness Van Dyke was improperly received. It was material for the plaintiffs not only to show that the company was insolvent at the time of the purchase, but that the defendants, or Mears the agent, or both, knew of such insolvency. (*McCrackan* v. *Cholwell*, 4 *Seld.* 133.) The testimony of Van Dyke went to show this knowledge, on the part of both, and was therefore proper.

Hunter *v.* Hudson River Iron and Machine Co.

It is said that the testimony only proved the declarations of Mears; that such declarations were not within the scope of his authority, even if an agent, and were therefore hearsay and immaterial. Even if this were so, they were proper to show knowledge in Mears, who afterwards testified, on the part of the defendants, that he did not know, at the time of the purchase, that the company was insolvent, and that he made the declarations to the plaintiffs which were proved, in good faith. But Mears was acting, at the time of those declarations, within the scope of his authority. He was transacting business with the witness as one of the firm of Hammond & Co. to whom the company was largely indebted, as their agent. He was endeavoring to obtain an extension of time, and as one inducement to the witness to consent, represented to him that unless time could be obtained the company must stop business and give up their property for the benefit of their creditors; that their indebtedness was from 75 to $78,000, and their assets amounted only to about 30 or $40,000. This conversation occurred the first week in April, a week or fortnight only before the purchase from the plaintiffs. The testimony, in my judgment, was clearly admissible, and the authorities hereafter cited abundantly show it.

3. It is insisted that the proof offered, that all the directors present at the time of the statement made by Mears, except him, expressed their surprise at the condition of the company, ought to have been received. The court permitted the defendants to show that none of those directors knew of the insolvency of the company, at that time, which could have been done by calling upon them to testify, as Pratt, one of them, had done. But the expression of their surprise was a matter wholly immaterial, and was properly rejected. It was a matter of no consequence, as will be hereafter shown, whether the defendants knew of their insolvency or not. But if it were, their expressing a surprise at Mears' statement would not show a want of knowledge on their part.

4. The next objection interposed by the defendants is that the mortgage was improperly received in evidence. The certificate of the justice states that Mears testified that he was the

treasurer of the company; that it was a corporation, but had no corporate seal; that he signed his name to the mortgage and affixed the seal (his seal) thereto, by the order and resolution of the trustees of said corporation, duly made and given in writing, and that the same was executed by him as such treasurer, for the purposes therein mentioned. In *Johnson* v. *Bush*, (3 *Barb. Ch. Rep.* 207, 233,) where the same objection was taken, as here, that the resolution of the board of directors ought to have been produced and proved, the chancellor decided that formerly the execution of the instrument under the corporate seal, if there was one, (and under the seal of the treasurer if there was no corporate seal,) was prima facie evidence of authority to execute the deed, which might be overcome by showing, either directly or circumstantially, that there was no authority, either general or specific, and that now it may be overcome by showing that there was no resolution of the board. The certificate in this case recites all that is necessary, in the first instance, and it would have been a very easy matter for the defendants to show that no such resolution had ever been passed, and that Mears swore falsely in so testifying. The mortgage was dated in January, 1854, but was not acknowledged until June of that year. Nevertheless, Mears, who was the treasurer, knew of its existence when it was executed, and it was not pretended that it was not made on the day it purports to bear date. It was properly received in evidence, therefore, even if not sufficiently proved as the act of the company, to show a full knowledge in Mears of the condition of the company on the day of its date. And it is not to be presumed, in the absence of all proof to the contrary, that Beach, who was involved with Mears in large liabilities for the company, did not know of its existence. This evidence was in a manner collateral, and was introduced to show an additional fact tending to prove the insolvency of the defendants, and a knowledge on the part of the company. It was not offered as between the parties to recover its amount, but to prove an act or *acknowledgment* of their own pecuniary condition. The mortgage was sufficiently proved for that purpose, and it was properly received in evidence.

Hunter *v.* Hudson River Iron and Machine Co.

These views dispose of all the primary objections, and bring us to the consideration of the only remaining question presented.

It is insisted that the motion for a nonsuit should have been granted, upon the grounds urged upon the trial. The first ground, in relation to the sufficiency of the complaint, has been already disposed of. The second, that the declarations of Mears were made without authority, and which is the principal one relied upon, remains to be considered. It has been already remarked that Mears was the treasurer and general agent of the company and was particularly employed to make the purchases of the goods which from time to time were effected, in New York and elsewhere, on credit. That he had the custody and control of the books, the making of the notes, and the transaction in short of all the principal business affairs. This is evident not only from his own testimony but from his acts which had been and were from time to time acquiesced in and sanctioned by the company. The other officers and stockholders depended on him for all information, in relation to its condition. Hence the assembling, and calling upon him for the statement to which he testified, and to which allusion has been before made. It was conceded on the argument that Mears was the treasurer, and that his powers were those of a general agent. But it was urged that although he had the power to make a contract for the purchase of goods, by the defendants, on credit, and could make and execute all the necessary notes and other papers as to the quantity purchased and the times of credit and payment, yet he had no authority to speak as to the credit of the company, so as to bind them; without an additional special authority. And the naked proposition is put forth, (for the argument certainly amounts to that,) that an irresponsible agent, one intrusted with the management of the whole affairs of a corporation, who is perfectly cognizant of their condition, may be authorized by them to purchase goods on credit and to execute notes in their name for the amount of the purchase money, and yet if he makes false representations in regard to the condition of the company, who receives the goods thus fraudulently obtained, it may turn around, in an action brought by the vendors to reclaim

them, and say, " you trusted to the word of our agent. He had no authority to say we were solvent, or to speak of our credit, so as to bind us. He was acting entirely without the scope of his authority, and you must look to him for your remedy." And this too by an association of men forming a *partnership* for particular purposes, and the agent whose acts are thus sought to be repudiated, one of the partners, having more knowledge of the affairs of the company than all the other associates. Neither the cases cited, nor the elementary writers quoted, sanction any such doctrine. A principal is liable for the fraud or misconduct of his agent; and he not only cannot take any benefit from a misrepresentation fraudulently made, but is bound to make the party compensation for the injury sustained. And this, although he may be *innocent;* provided the agent acted within the scope of his authority. There need not be express authority to make a particular representation, but the authority may be implied, as incident to a general authority. (1 *Parsons on Cont.* 62, *and notes. Angell & Ames on Corp.* 291, 301, 302. *Story on Agency,* §§ 45, 46 *and cases cited.* 3 *Seld.* 364, 365. 11 *Wend.* 518.) The authority to Mears to purchase was authority to make the necessary representations as to the credit and solvency of the defendants ; just as much so as it was to receive the goods and accept the delivery for the company. Such authority was necessarily incident to the power to purchase on credit. The declarations were part of the *res gestæ,* and were equally obligatory upon the principal as if made by himself. In no other way could there be any safety to third persons in dealing with an agent. The defendants, or those composing the company, knew perfectly well that one of the first facts necessary for them to establish to the satisfaction of a vendor, to obtain a credit, would be their ability to pay. That probably the very first question (as indeed it was) would be, what are your pecuniary circumstances? "*How are you getting along ?*" Mears, acting under his authority as treasurer and agent, and with a full knowledge, as the jury found, answered these question in a manner to satisfy the plaintiffs of the ability of the company to pay, and succeeded in effecting

Hunter *v.* Hudson River Iron and Machine Co.

his purchase. And even if the other defendants did not know, at the time, that his representations were false, they are liable upon the principle that of two innocent parties, the one shall suffer who, by his *agent* causes the injury, and will in all such cases receive the least harm. As in this case, the plaintiffs parted with their goods upon the false representations of the defendants' agent, they were delivered to the defendants without consideration. And the plaintiffs by their action have reclaimed them, that is have received them back from the company who have paid nothing for them, and seek to hold them, upon the naked assertion that they are not bound by the declarations of the fraudulent agent—one who is a *partner* with them, and is to participate in the profits of his own fraud. This, clearly, cannot be the law, within any of the cases. The company held Mears out to the world as their principal agent, authorized and empowered to transact their business generally; and whether the principal is defrauded by his representations, or not, is a matter of no consequence, in the application of the principle as to liability to third persons. (*Story on Agency*, § 452.) The agent was apparently, and I might say necessarily, authorized to make the representations which he did, else the purchase could not have been effected. They were according to the usual course of business in purchasing goods on credit. Mears had so purchased before, and had no doubt made like representations. The defendants composing the company all well knew that the goods could not have been obtained, without them. They sent him to purchase, as a man on whose word reliance could be placed. And they as a corporation are liable for his acts and frauds while acting apparently within the limits of his authority, in the same manner as individuals. (*See opinions* in the case of *The Mechanics' Bank* v. *The New York and New Haven Rail Road Co.*, recently decided by the superior court of New York.)

I think the defendants are also liable on another ground. Mears was not only the treasurer and agent of the company, but he was a member of it, a partner in a joint stock association; and his knowledge and his acts were the knowledge and

acts of the partners, within the principle laid down in *Jeffrey* v. *Bigelow*, (13 *Wend.* 518.)

It is said that a fair construction of the declarations of Mears would not authorize the plaintiffs to maintain this action. Those representations were undoubtedly made with an object, and that object was to induce the plaintiffs to believe the company were solvent and able to pay. The jury have so found, as a question of fact, and that and all other questions were properly and fairly submitted to them, as no exception seems to have been taken to the charge.

It is further said that there was no proof that the company knew, at the time, that the representations of Mears were false. It has been shown that this was not necessary. But I am not prepared to say there was no proof on that subject. The jury have passed upon it, and found in favor of the plaintiffs on that as well as the other facts of the case. The defendants' counsel must have overlooked the admission that the company was insolvent for many thousands of dollars, as well as the testimony of Mears and the other evidence in the case, when he gravely put forth as a 4th ground of nonsuit, that there was a total absence of proof that the defendants were insolvent at the time the representations were made. The evidence was abundant and overwhelming on that subject, and the jury have found, and well found, in my judgment, that Mears well knew the fact, when he made the purchase.

I can see no good reason, after a careful examination of all the facts in this case, for disturbing the verdict ; and judgment must be rendered for the plaintiffs.

[St. Lawrence General Term, September 3, 1855. *C. L. Allen, Bockes* and *James*, Justices.]